# AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Colin M. Simons, Affiant, being first duly sworn, hereby depose and state as follows:

## Introduction and Affiant Background

1. I am a Special Agent with the Federal Bureau of Investigation (FBI) currently assigned to the Burlington, Vermont, office, which is part of the Albany, New York Division. I have been a Special Agent with the FBI for over 20 years. I am responsible for working cases involving a variety of criminal violations to include drug investigations, violent crimes, and gangs/drug trafficking organizations. I have been the affiant for numerous federal complaints and search warrants pertaining to violent crimes and narcotics. As a Special Agent, I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States.

2. Based upon this experience, I have become knowledgeable of the methods and modes of narcotics operations and the language and patterns of drug abuse and trafficking. I have gained knowledge in the use of various investigative techniques including physical and electronic surveillance, confidential informants, cooperating witnesses, controlled purchases of illegal narcotics, consensually monitored recordings and interviews, and service of legal process including subpoenas and search warrants. I have worked directly with confidential informants to conduct controlled purchases of controlled substances, and I have become familiar with the ways that controlled substances are transported, stored, and distributed. During these investigations, I have listened to and reviewed numerous communications between individuals involved in or suspected to be involved in the distribution of controlled substances. As a result of these investigations, I also have experience in debriefing defendants, informants, participants, and various persons directly involved in buying and distributing controlled substances, and I have

become familiar with the language and terminology used by those persons, the prices of controlled substances, the packaging used to distribute these substances in this region, and the organizational structure of enterprises that traffic in controlled substances.

3. I submit this affidavit to establish probable cause to believe that on or about April 9, 2026, in the District of Vermont, [redacted] DANIELLE McALLISTER violated 21 U.S.C. §§ 841(a), 841(b)(1)(C) and 18 U.S.C. § 2 by knowing and intentionally distributing fentanyl, a Schedule II substance, and aiding and abetting such distribution.

4. The information contained within this affidavit is based upon my training and experiences, as well as information conveyed to me by other law enforcement officers including Detective Andrew Todd and Detective Sergeant Ryan Wood of the Vermont Drug Task Force (VDTF). The following are either known to me personally or have been related to me by people having direct knowledge of the events described, including but not limited to other law enforcement officers involved in this investigation or cooperating individuals. This affidavit does not represent every fact known to me that is related to this investigation as it is only for establishing probable cause. Any statements of witnesses included below are described in sum and substance, unless specifically indicated as quotations, and are not meant to represent the full statements made.

## **Probable Cause**

### ***Background of the Investigation***

5. In March 2026, the VDTF began conducting a criminal investigation into the sale of fentanyl in the town of Westminster, Vermont. The target of this investigation was McALLISTER. The VDTF utilized a confidential informant (CI) during the investigation.

***Background of CI***

6. The CI told investigators that s/he knew McALLISTER and could purchase drugs from her. For purposes of protection, the CI will be referred to herein using s/he and him/her pronouns. Members of the VDTF provided the following information about the CI. The CI worked with VDTF in exchange for consideration on pending firearm and narcotics charges, and was paid money for his/her assistance for certain controlled purchases s/he conducted, including the one described below. The CI's criminal history includes convictions for domestic assault, possession of marijuana, disorderly conduct, open container, and petit larceny. The CI is currently facing pending federal narcotics charges.

7. The VDTF operated the CI for several months. There were several periods of time (after the controlled purchase described below) where the VDTF was unable to make contact with the CI. During those times, uniformed officers were sent to the CI's residence to make contact with him/her and tell him/her to contact the VDTF. Det. Todd advised the CI that his/her lack of communication was unacceptable and that it violated the Confidential Source Agreement s/he had with the VDTF.

***April 2026 Controlled Buy***

8. In April 2026, the VDTF coordinated a controlled purchase of fentanyl from McALLISTER [redacted] using the CI.

9. When the CI arrived at the predetermined pre-transaction meeting location with law enforcement, the CI advised law enforcement that s/he had been recently communicating with McALLISTER via cell phone and could buy a bun of heroin from her. The CI advised a bun of heroin was ten bags of heroin. Based upon my training and experience I know a bun of heroin is a phrase used to describe ten individual doses of heroin.

10. Law enforcement then instructed the CI to call McALLISTER to arrange this deal via cell phone. During the phone call, McALLISTER answered the phone and she and the CI discussed what the CI wanted to buy and where they would meet to conduct the transaction. The call was recorded and Det. Todd recognized McALLISTER's voice from previous narcotics investigations involving her.

11. Following this phone call, both the CI and his/her vehicle were searched and no contraband or weapons were located. Found on the CI's person was $7.00 cash, which investigators took possession of for safekeeping during the controlled purchase. Law enforcement then provided the CI with $100 in prerecorded VDTF funds for use in the transaction and equipped the CI with audio/video recording and monitoring devices.

12. The CI traveled to the agreed upon meeting location while under continual observation by the surveillance team. In addition to surveillance, investigators continually monitored the CI and the transaction via audio/video/recording/transmitting/GPS devices. Investigators observed the CI drive directly to the meeting location. Approximately five minutes after the CI arrived at the meeting location a silver vehicle was observed by the surveillance team park next to the CI's vehicle. A female subject, who Det. Todd immediately recognized as [redacted] from previous narcotic investigations, entered the CI's vehicle sitting in the front passenger seat. Det. Todd observed [redacted] was holding a small plastic bag in her left hand.

13. Once [redacted] was inside the CI's vehicle, the CI identified her as [redacted] and then Det. Todd could see [redacted] put the suspected drugs in the center console area of the vehicle. The CI and [redacted] made small talk and [redacted] stated that she was with "DANI." Moments later, Det. Todd saw the CI hand [redacted] the money that had been provided by the VDTF. [redacted] then stated, "do you want 10 back" and "usually it's 50." Det. Todd could then see [redacted] giving the CI back

$60.00 and heard [redacted] state "I'll just take the forty and I'll tell her that's all you had." Det. Todd then observed [redacted] exiting the CI's vehicle. The CI departed the area and returned to meet investigators at a predetermined meeting location while under continual observation by the surveillance team.

14. At the meeting location, the CI provided investigators with the suspected drugs just obtained and unused buy money. Investigators searched the CI's person and his/her vehicle. No additional contraband, weapons or money were located.

15. Law enforcement obtained a sworn statement from the CI. The following is a summary of the recorded statement:

a. CI advised s/he had met with Det. Todd to engage in a controlled buy of "Heroin" from McALLISTER. CI advised that s/he communicated with McALLISTER and asked her if she had any "Heroin" and/or "down" and McALLISTER stated that she did. CI advised that they then agreed on a location to meet.

b. CI advised upon arrival s/he met with [redacted]. CI stated that [redacted] showed up with McALLISTER who was driving the vehicle. CI advised s/he then met with [redacted] and gave her the money that s/he was provided with, and [redacted] gave him/her "Heroin" in return.

c. CI advised that s/he then departed and met with Det. Todd and immediately provided him with the drugs that s/he had purchased and was searched for a second time and no money and/or contraband was located on him/her.

d. CI advised when s/he met with [redacted] s/he did not do anything s/he was not instructed to do and did not manipulate the drugs and/or money in any way. Furthermore, the CI stated that s/he was in possession of the electronic recording devices and did not manipulate or attempt to manipulate the devices in any way.

e. CI advised that all the information s/he provided in the audio recorded statement was true and accurate. CI's $7.00 was returned to him/her prior to departing.

16. VDTF's continuous monitoring of the audio/recording/transmitting/GPS devices during the controlled buy, along with the real-time surveillance, matched the CI's description of what occurred during the controlled buy.

17. VDTF Detective Seth Wild field tested a sample of the suspected heroin utilizing a NARK II Kit and the results indicated it was positive for fentanyl. There were a total of ten bags contained inside white wax bags with a blue stamp with the words "Brick City." The suspected fentanyl was placed into a temporary locker at the Vermont State Police's Westminster Barracks and were later delivered to the Vermont Forensic Laboratory for further analysis.

***Further Information About The CI***

18. In June 2026, approximately two months after the controlled buy into McALLISTER [redacted], the CI advised s/he was not engaging with anyone involved with drugs, including McALLISTER [redacted]. A short time later in June 2026, Det. Sgt. Wood happened to see the CI's vehicle while he was working. Det. Sgt. Wood noticed what appeared to be a drug transaction involving the CI's vehicle. The observations led to a police interaction resulting in a state search warrant for the vehicle and the subsequent arrest on drug charges of the individual (not the CI) who was driving the vehicle (the "Driver"). Det. Todd spoke to the CI following this incident. When asked who Driver was, CI stated it was a friend of a friend from work. When asked if the Driver was using the vehicle to sell drugs, the CI responded "absolutely not." CI further stated the Driver was using the vehicle to bring the Driver's girlfriend [redacted] to dinner. The CI denied having spoken with [redacted] recently.

19. Several days later, CI met with the VDTF to again discuss the actions involving his/her vehicle. During this meeting, the CI admitted s/he had met the Driver several weeks ago through [redacted] and that the individual was a big drug dealer. CI also admitted s/he failed to disclose his/her involvements/interactions with the Driver and [redacted] to the VDTF. Further CI admitted the Driver gave the CI's girlfriend cocaine base as compensation to use the CI's vehicle. Det. Todd then asked the CI to show CI's phone to him so he could see the communications between the CI and the Driver and [redacted]. While scrolling through the phone, Det. Todd observed the phone log and text messages on the CI's phone had been deleted, except for the last phone call that Det. Todd had with the CI prior to the CI meeting with the VDTF. The CI was reminded that s/he was supposed to keep all communications and that his/her actions violated his/her agreement with the State's Attorney's office and the VDTF. Det. Todd told the CI that he believed s/he was engaging in drug activity.

20. Also during the summer of 2026, an individual was arrested on state drug and firearms charges. That individual informed law enforcement that they were selling two to three ounces of cocaine to the CI from each trip the person took to resupply. Det. Todd subsequently reviewed this person's Facebook Messenger Messages with CI. The messages dated from prior to the CI agreeing to work with the VDTF as a CI and continued through the beginning of June 2026. The messages appear to discuss numerous drug deals between the CI and this individual. The CI was not authorized by the VDTF to engage in this behavior.

21. The VDTF terminated the CI as a cooperating individual. In addition, the narcotics charges that the CI had been working off pursuant to the Confidential Source Agreement have now been filed in federal court. Those charges are the pending federal charges noted above.

**Conclusion**

22. For the reasons set forth in this affidavit, probable cause exists to believe that, on or about April 9, 2026, in the District of Vermont, [redacted] DANIELLE McALLISTER violated 21 U.S.C. §§ 841(a), 841(b)(1)(C) and 18 U.S.C. § 2 by knowing and intentionally distributing fentanyl, a Schedule II substance, and aiding and abetting such distribution. I request that the Court issue a criminal complaint charging both individuals accordingly.

Dated at Burlington, in the District of Vermont, this 10th of August, 2026.

Colin M. Simons
Special Agent
Federal Bureau of Investigation

Sworn and subscribed before me this 10th day of August, 2026.

Honorable Kevin J. Doyle
United States Magistrate Judge